BIGLOW v. CONRADT et al.

(Third Division. Fairbanks. October 27, 1906.)

No. 542.

1. MINES AND MINERALS (§ 27*)—PLACER MINES—OVERLAPPING CLAIMS.

The locator of a placer mining claim set two center stakes only, and described his outer boundaries by writing thereon that he claimed 490 feet on each side of the base line running from center stake to center stake. Defendants thereafter located another placer claim more than 490 feet away from the base line, alongside the first claim, and marked its boundaries with corner stakes, and entered into possession and were mining thereon. Afterward the plaintiff extended the original claim by setting out corner posts more than 490 feet from the center base line, and thus overlapping defendant's claim. *Held*, that the attempt to extend the original claim over defendant's claim was void and gave no title to plaintiffs.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 64, 65; Dec. Dig. § 27.*]

2. MINES AND MINERALS (§ 27*)—PLACER MINES—POSSESSION OF OTHER CLAIMANT.

One cannot locate placer mining ground of which another is in actual possession and engaged in mining in compliance with the mineral laws of the United States.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 64, 65; Dec. Dig. § 27.*]

The controversy in this case arises over an overlap between creek claim No. 6A below discovery, and bench claim No. 6, right limit, below discovery, on Esther creek, in the Fairbanks mining district, Alaska. From the evidence offered before the court on the trial on August 20, 1906, and the exhibits and maps filed therewith and used therein, the court finds the following to be the facts in the case:

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

### 1. Location and Marking the Boundaries.

Early in the spring of 1904 Sam Carruthers located creek claim No. 6 below discovery on Esther creek. So far as the evidence discloses he placed but two stakes to mark his boundaries, an upper and lower center stake. Subsequent to Carruther's location, and on February 27, 1904, Sjoblom ("Teddy Bloom") located bench claim No. 6 below discovery on the left limit, and marked its corners with stakes, and at the same time Coyner located bench claim No. 7 below discovery on the left limit, and marked its corners with stakes. On March 19, 1904, the defendant Sjoblom, as the agent in fact for the locator, William Salmon, located bench claim No. 6 below discovery on the right limit, and marked its corners with stakes, so that its boundaries could be readily traced. Gus Conradt assisted Sjoblom in setting these corners, and they were all set on the same day by these two, and the northeast corner was then blazed and located by them, and yet remains where it was then placed.

Thereafter, and in the month of August, 1904, Carruthers and August Anderson ascertained that creek claim No. 6 below discovery was largely in excess of 20 acres, and acting together, and on September 14, 1904, they located the downstream excess of No. 6 in the name of Anderson, and called it "6A" creek claim. At the time they relocated this excess off No. 6 and called the new location "6A," Carruthers and Anderson set out two stakes to mark the boundaries of "6A"—an upper and lower center stake, with a well-cut base line connecting them. Their lower center stake was the old lower center stake of No. 6, and they set up a new upper center stake for "6A," which also became the lower center stake of No. 6 creek claim as readjusted. Anderson wrote a location notice upon the upper and lower center stakes of "6A" substantially as follows:

"No. 6A Below, on Esther Creek. I claim from this stake one thousand feet up stream [and on the upper stake "down stream"] and four hundred and ninety feet on each side of this stake for mining purposes. September 1, 1904.        August Anderson, Locator."

At the same time Anderson also drew in pencil two arrows on each stake, one pointing to the right and the other to the left limit, at right angles to the base line from center stake to center stake, and over each arrow he placed in pencil "490 feet," thus giving notice on each stake that he claimed a location 1,000 feet long by 980 feet wide. No. 6A was not further marked upon the ground until in the last of April or the first part of May, 1905, when Anderson and Carruthers set out the four corner stakes.

## 2. Recording Location Notices.

A sufficient notice of the location of bench claim No. 6, right limit, was filed and recorded for Salmon on June 15, 1904, and a sufficient notice of the location of creek claim No. 6A was filed and recorded for Anderson on September 13, 1904. Both notices were recorded within the time limited by law. No question is raised but that all claims in question were recorded in compliance with the law.

## 3. Discovery of Mineral.

Immediately after setting and marking the center stakes of No. 6A, blazing the base line from center stake to center stake, and recording, and in September and October, 1904, Anderson and Carruthers brought a steam boiler upon 6A for thawing the frozen soil and gravel, and sunk a discovery shaft within their 490-foot limit to a depth of 39 feet—31 feet through muck and 8 feet into the gravel, where they found colors of gold, upon which they claimed a discovery for 6A as then located and marked.

On May 4, 1905, A. H. Winters inspected 6A and secured from Anderson and Carruthers an option to purchase and a

working lease of the lower 300 feet by the width of the claim. These papers were signed and delivered on May 6th, and immediately thereafter Winters entered upon 6A on the lower 300 feet so leased, and continued the discovery shaft sunk by Anderson and Carruthers the year before from their 39-foot level to bed rock, which they reached about August 5, 1905, and made a discovery of gold on bed rock. This shaft is located on the left limit of the No. 6A base line on the lower 300 feet of the claim, and within 490 feet of the base line. Winters continued work on his 300-foot leased ground and sunk other shafts, and is still at work thereon in good faith, using and developing the ground as a paying mine.

Sjoblom began to work on bench claim No. 6, right limit—the Salmon bench—in April, 1905, to sink a discovery shaft. He met with an accident, and his work was delayed, though his shaft "No. 8" was sunk 14 feet and then abandoned for work in "No. 9," a common shaft on the common corner of bench claims Nos. 5 and 6, and Hardin fraction, and was begun on June 5th and sunk 82 feet by July 10, 1905, when they found colors of gold in the gravel, though the shaft was continued downward and reached bed rock in January, 1906, when they found better discovery. Defendants began their shaft "No. 7" on the overlap with "No. 6A" and the Salmon bench on March 22, 1906, and reached bed rock in it on April 17, 1906. Berry, one of the plaintiffs, loaned the defendants his boiler to enable them to sink this shaft No. 7, and he and his coplaintiff Biglow examined the work, panned the dirt coming out of the shaft, had full knowledge that the defendants were on the ground which constitutes the overlap, and made no objection to their work until after they reached bed rock in the shaft.

### 4. Possession and Work.

So far as the evidence in this case discloses the facts, they justify the court in finding that at all times in controversy the

plaintiffs and their grantors had actual possession of No. 6A, and were engaged in good faith in developing it as a placer mine, and that at all such times the defendants and their grantors had actual possession of No. 6, right limit—the Salmon bench—and were engaged in good faith in developing it as a placer mine. All parties have shown good faith as to possession and work in compliance with the mining law.

It is a fact that on or about the last of April or the first part of May, 1905, when Carruthers and Anderson set out their stakes and marked their side lines of "6A," the side lines of the Salmon bench and all its corners were marked with stakes, where they stand at present, and were so marked from the date of their location on February 27, 1904, and that such stakes were of such a character and the lines so marked that the boundaries of the Salmon bench could be readily traced. Up to that time, the only marking of "6A" was on the two center stakes, the upper and lower, and that the calls for 490 feet thereon did not reach or embrace any part of the Salmon bench, and that prior to the time when Carruthers and Anderson set out their right limit side stakes about the 1st of May, 1905, they had had no possession of any part of the Salmon bench, which was at all times in possession of the defendants.

About the 1st day of May, 1905, Carruthers and Anderson set out these right limit stakes of "6A." The lower right limit corner stake was set 609 feet at right angles to the center base line and south from the lower center stake. The upper right limit corner stake was set $520^7/_{10}$ feet at right angles to the center base line and south from the upper center stake, and as these two stakes were set out about May 1, 1905, the right limit of "6A" was greatly extended southward, and overlapped the Salmon bench claimed by the defendants. Prior to setting these right limit stakes no part of the Salmon bench was overlapped by "6A" by the call for distances, either on its stakes or in the notice of the location thereof.

The controversy arises over this overlap. Who owns the overlap—the defendants by reason of their location of No. 6, right limit, or the plaintiffs by reason of the location of "6A"?

McGinn & Sullivan, for plaintiffs.

Heilig & Tozier, for defendants.

WICKERSHAM, District Judge. Counsel have tried this case upon the theory that the excess over 20 acres in "6A" was the important feature in the case; but a careful study of the evidence has led me to the conclusion that that is not so important as two other features which seem to me to be decisive of the controversy.

The first of these is that the area in "6A" was for about a year after its location limited by the calls for distances on its center stakes of 490 feet on each side thereof. These two center stakes were set on September 14, 1904, by Carruthers and Anderson, and the area of "6A" as then claimed by them was from the lower to the upper center stake, called 1,000 feet, but actually only 872 feet; and 490 feet on each side of the base line, and thus containing less than 20 acres.. Their discovery shaft, in which at a depth of 39 feet they claim to have discovered gold, was within this area, and conceding that they made such discovery in September, 1904, it gave life to a claim only 872 feet long by 980 feet wide. No outboundary stakes were then set, and no outboundaries known or claimed, except those indicated by the calls for distances on the center stakes. That area did not include any part of the overlap now in controversy. That was all outside the boundaries of "6A" at the time of that discovery.

The second admitted fact, which seems a decisive one, is that when, about the last of April or the 1st of May, 1905, Anderson and Carruthers first set out their outboundary stakes as they now stand, and thus extended the side lines of "6A" so as to overreach the Salmon bench and create the overlap in

controversy, the defendants were in the actual possession of the whole of the Salmon bench and engaged in seeking to make a discovery of mineral thereon. The Salmon bench had been thus marked on March 19, 1904, more than a year before Anderson and Carruthers attempted to extend the boundaries of "6A" by setting stakes at its corners. This being admitted, it seems to me to follow as a matter of law that Carruthers and Anderson could not, by extending their boundaries, include any part of the claim of the defendants. 1 Lindley, § 373; O'Reilly v. Campbell, 116 U. S. 418, 6 Sup. Ct. 421, 29 L. Ed. 669. Nor can one thus locate additional ground of which another is in the actual possession, because it is not vacant, unoccupied, and unappropriated lands. Eilers v. Boatman, 3 Utah, 159, 2 Pac. 66, 15 Mor. Min. Rep. 462; Id., 111 U. S. 356, 4 Sup. Ct. 432, 28 L. Ed. 454; McIntosh v. Price, 121 Fed. 716, 58 C. C. A. 136. So far as the evidence in this case discloses the fact, the defendants were in actual possession of the Salmon bench when Carruthers and Anderson thus sought to overlap it, and have been in the good-faith possession thereof ever since, and have engaged in working it for the gold therein.

Judgment for defendants.